**UNITED STATES of America, Plaintiff,**

v.

**Camille POLLARD, Defendant.**

No. Crim. NO. 2001–190.

District Court, Virgin Islands, D. St. Thomas and St. John.

June 18, 2002.

Kim L. Chisolm, Assistant U.S. Attorney, St. Thomas, U.S.V.I., for the plaintiff.

Douglas Beevers, Assistant Federal Public Defender, St. Thomas, U.S.V.I., for the defendant.

## MEMORANDUM

MOORE, District Judge.

Imagine that you are at the Philadelphia airport for a flight to Atlanta. You present your ticket along with whatever form of identification the airline requires at the check-in counter. The airline agent then directs you to airport security and the airline departure gate. Imagine that as you approach the security and gate area, you are confronted by another set of counters, identified as an immigration departure checkpoint at which all travelers are required to apply for admission into the United States before they may board their flights from Philadelphia to Atlanta and other U.S. cities. The signs tell all travelers that "proof of citizenship is required," with words to the effect that travelers should have their documents ready. Imagine that everyone who wants to get on that airplane to Atlanta—permanent alien residents, visitors on temporary visas, United States citizens—must stand behind a yellow line until called by an immigration inspector to approach and prove their right to be in the United States.

This Alice–in–Wonderland scenario must be imagined because it can exist nowhere within the fifty United States and the District of Columbia. It would clearly violate the constitutional right of free travel to require every person to apply for admission to the United States each time she flies from one State to another. Yet this is precisely the procedure the United States Government has imposed upon travelers, both citizens and non-citizens, from the Territory of the Virgin Islands. Before any person can fly directly from St. Thomas, Virgin Islands, to the continental United States, or even to Puerto Rico, she must apply to be admitted to the United States and must present herself in person to an immigration inspector for examina-tion of her right to enter the United States.

This criminal prosecution squarely presents the question whether the permanent immigration Departure Control Gate operated by the United States Immigration and Naturalization Service ["INS"] at the St. Thomas airport in the United States Virgin Islands is compatible with the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment or the equal protection component of the Due Process Clause of the Fifth Amendment.

Although I am mindful of the nationwide concern and renewed congressional and executive efforts to tighten control of the flow of aliens across our international borders since the attacks of September 11, 2001, I nevertheless must conclude that the operation of this non-border, internal Departure Control checkpoint is inconsistent with both our well-settled principles of equal protection under the law and freedom from unreasonable searches and seizures. To paraphrase the Supreme Court, the law enforcement needs of the United States in the Virgin Islands are indistinguishable from those in many of the States:

> [The Virgin Islands] is not unique because it is an island; like [the Virgin Islands], neither Alaska nor Hawaii are contiguous to the continental body of the United States. Moreover, the majority of all the states have borders which coincide in part with the international frontier of the United States.

*Torres v. Commonwealth of Puerto Rico,* 442 U.S. 465, 474, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979) (holding unconstitutional a search conducted by police pursuant to a local law authorizing them to search the luggage of persons arriving in Puerto Rico from the United States).

## I. BACKGROUND

### A. Regulatory and Statutory Authority

Part 235 of title 8 of the Code of Federal Regulations, titled "Inspection of Persons Applying for Admission," governs the procedure for the inspection of persons applying for lawful admission to the United States. Through the mechanism of "preinspection," section 235.5 applies these procedures to the Virgin Islands. *See* 8 C.F.R. § 235.5(a) (providing for preinspection in United States territories and possessions).[1] Before an aircraft may depart, each and every person, whether an alien or a United States citizen, flying "directly and without touching at a foreign port or place" from the United States Virgin Islands to Puerto Rico "or to one of the States of the United States or the District of Columbia" must be examined by an immigration officer to determine her or his admissibility to Puerto Rico or the continental United States. *See id.* § 235.1(d)(1) ("Alien applicants for admission") ("Each alien seeking admission . . . shall present whatever documents are required and shall establish to the satisfaction of the immigration officer that he or she is not subject to removal . . . and is entitled . . . to enter the United States."); *id.* § 235.1(b) ("U.S. citizens") ("A person claiming U.S. citizenship must establish that fact to the examining officer's satisfac-

tion. . . . If such applicant for admission fails to satisfy the examining immigration officer that he or she is a U.S. citizen, he or she shall thereafter be inspected as an alien.").

According to the United States, subsection 235.5(a) is the regulatory implementation of section 212(d)(7) of the Immigration and Nationality Act:

> The provisions of subsection (a) [classes of aliens ineligible for visas or admission] (other than paragraph (7) [documentation requirements for immigrants and nonimmigrants] ) shall be applicable to any alien who shall leave Guam, Puerto Rico, or the Virgin Islands of the United States, and who seeks to enter the continental United States or any other place under the jurisdiction of the United States. . . .

Immigration and Nationality Act § 212(d)(7), 8 U.S.C. § 1182(d)(7). The evidence in this case has established that the Departure Control Gate is the procedural equivalent of a Foreign Arrivals Gate. As will be demonstrated, these statutory and regulatory provisions as applied to the Territory of the Virgin Islands represent a vestigial appendage to the current immigration laws that has long outlived the reasons for its original incorporation in the immigration laws of 1917.

---

1. The section provides for preinspection of applicants for lawful entry into the United States as follows:

 (a) In United States territories and possessions. In the case of any aircraft proceeding from Guam, Puerto Rico, or the United States Virgin islands destined directly and without touching at a foreign port or place, to any other of such places, or to one of the States of the United States or the District of Columbia, the examination of the passengers and crew required by the Act may be made prior to the departure of the aircraft, and in such event, final determina-

 tion of admissibility shall be made immediately prior to such departure. . . . When the foregoing inspection procedure is applied to any aircraft, persons examined and found admissible shall be placed aboard the aircraft, or kept at the airport separate and apart from the general public until they are permitted to board the aircraft. No other person shall be permitted to depart on such aircraft until and unless he or she is found to be admissible as provided in this section. 8 C.F.R. § 235.5(a). For a description of the examination "required by the Act," *see* 8 C.F.R. § 235.1.

## B. Factual History

On May 13, 2001, the defendant arrived in the Virgin Islands on a Cape Air flight and presented herself at the Foreign Arrivals Gate at the St. Thomas Cyril E. King Airport as one Katisha Kenya Norris, resident of New York. At Foreign Arrivals, she was examined by an INS inspector and admitted to the United States as a United States citizen. Later that day, the defendant attempted to pass through the Departure Control checkpoint at issue here to board an outgoing flight to New York and encountered another immigration inspector, Allison Haywood. The defendant again presented herself as the U.S. citizen, Katisha Kenya Norris, using a "nongovernmental" New York identification card bearing that name. In response to Inspector Haywood's routine request that she state her citizenship, the defendant replied that she was a United States citizen.[2] Inspector Haywood then asked where the defendant was born, and the defendant responded that she was born in Queens, New York. Inspector Haywood asked for a birth certificate, and the defendant presented a New York birth certificate bearing the name Katisha Kenya Norris. Upon further questioning, the defendant stated that she had lived in New York all her life and went to school in New York. Because Inspector Haywood did not detect a "New York accent," she asked the defendant if she could name her school in New York. The defendant could not remember the name of the school, nor could she recall her father's middle name as it appeared on the birth certificate.

Suspicious of these answers and the defendant's "nervous" demeanor, Inspector Haywood called over a secondary inspector. The secondary inspector, James X. Beckerleg, took the defendant from the primary inspection line at the Departure Control Gate to the secondary inspection area near the Foreign Arrivals border checkpoint (through which the defendant had been admitted as a United States citizen only hours earlier). (*See* Aug. 30, 2001 Hr'g Tr. (excerpt) at 5 (testimony of James X. Beckerleg).) To Inspector Beckerleg, the defendant's New York birth certificate appeared to be a "good document," but he had never seen the kind of nongovernmental New York photo ID that she had presented to Haywood. Inspector Beckerleg asked a series of questions similar to those asked by Inspector Haywood. At the same time, he ran a background check on Katisha Kenya Norris on the FBI's National Crime and Information Center database and the INS's immigration database, which turned up nothing under that name. Concluding that the nongovernmental picture ID was fake, Inspector Beckerleg then read the defendant her *Miranda* rights on the belief that she had made a false claim to U.S. citizenship. The defendant waived her rights and admitted to Beckerleg that she is a citizen of Guyana and that her true name is Camille Pollard ["Pollard"]. She was charged with violating 18 U.S.C. § 911 ("Whoever falsely and willfully represents h[er]self to be a citizen of the United States shall be fined under this title or imprisoned not more than three years, or both.").

Pollard moved to suppress her statement made to Inspector Beckerleg on the ground that it was either involuntary or the product of an invalid waiver of her

2. The exact sequence of events is not entirely clear in the record. Inspector Haywood testified at one point that the defendant placed her New York ID card on the counter after she was asked about her citizenship and after she had stated that she was a citizen. (*See* Apr. 4, 2002 Hr'g Tr. at 103–104 (testimony of Allison Haywood).) Asked to state "with particularity and specificity . . . what exactly happened," Inspector Haywood testified the defendant placed her New York ID on the counter *before* she was asked about her citizenship. (*Id.* at 105.)

*Miranda* rights. At a hearing held August 30, 2001, and after it became clear that Pollard's statement was the voluntary product of a valid waiver of her *Miranda* rights, Pollard raised the additional grounds that her statement should be suppressed because it was obtained as the result of an unconstitutional seizure under the Fourth Amendment and a violation of her right to equal protection under the law. I ordered supplemental briefing and held another hearing on the motion to suppress on April 4, 2002.

## II. DISCUSSION

In considering the relative positions of Pollard and the United States, I recall the words of Mr. Justice Stewart as he reminded us of the abiding conflict between the interests of law enforcement agents and private individuals: "The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Almeida–Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). These words are a particularly apt prelude to my analysis in this case, recognizing as I do the attention the cowardly attacks of September 11, 2001, have appropriately focused on the need for tighter control of the nation's borders.[3] It is most

important for me to emphasize that this case *does not* involve procedures for interdicting aliens attempting to enter the United States at an international border. Indeed, the defendant already had been admitted to the United States by an immigration inspector at the Foreign Arrivals border checkpoint at the St. Thomas airport port-of-entry to the United States. (*See* Gov't Opp'n to Mot. Suppress, Ex. 1.)

What this case involves is the constitutionality of the non-border, internal Departure Control Gate at the St. Thomas airport and the statute and regulation on which it is based. My sworn duty is to require the Congress and the Executive Branch, acting through the INS, to conform the enactment and implementation of immigration laws to the confines of the Constitution. I first address Pollard's contention that the seizure of her person at the checkpoint violated her Fifth and Fourteenth Amendment constitutional guarantee of equal protection. I then address her distinct but related contention that the seizure violated her right under the Fourth Amendment to be free from unreasonable seizure of her person.

### A. Equal Protection

Before ruling on Pollard's equal protection challenge, I describe the procedures set forth in the relevant statute and regulation as embodied in the St. Thomas airport Departure Control checkpoint.[4]

---

**3.** *See, e.g.,* Enhanced Border Security and Visa Entry Reform Act of 2002, Pub.L. 107–173 (enacted May 14, 2002) (strengthening, among other things, the requirements for arrival manifests for planes and passenger ships traveling from places outside the United States); *see also, e.g.,* USA Patriot Act, Pub.L. 107–56, 115 Stat. 272 (Oct. 26, 2001) ("An Act [t]o deter and punish terrorist acts in the United States and around the world, to enhance law enforcement investigatory tools, and for other purposes.")

**4.** From the outset, the United States has been disappointingly recalcitrant in providing in-

formation I have requested to allow me to give full and fair consideration of the issues raised here by the defendant. For example, when asked to provide information about the protocol used for preinspection at the Luis Munoz Marin airport in Puerto Rico, the United States responded by insisting that it is either "not determinative" of the issues at hand, or that the defendant carries the burden of showing that the governmental actor made a discriminatory classification. (*See* Gov't Resp., Feb. 22, 2002 at 4–5.) When ordered to provide the Court with information regarding the purpose and origins of the St.

### 1. *The Statute, Regulation, and Departure Control Checkpoint*

I preface this discussion with the observation that the treatment of the Territory of the Virgin Islands under immigration law is at best described as schizophrenic. Even though Congress has defined the Territory of the Virgin Islands as a "state" and as part of the "United States" for immigration purposes, *see* 8 U.S.C. § 1101(36), (38), Congress at the same time has required that aliens already legally in the Virgin Islands must reapply for admission and entry into the continental and other parts of the United States:

> The provisions of subsection (a) (other than paragraph (7) [defining classes of aliens ineligible for visas or admission to the U.S.]) shall be applicable to any alien *who shall leave . . . the Virgin Islands of the United States, and who seeks to enter the continental United States* or any other place under the jurisdiction of the United States: The Attorney General shall by regulations provide a method and procedure for the temporary admission to the United States of the aliens described in this proviso. Any alien described in this paragraph, who is denied admission to the United States, shall be immediately removed. . . .

Immigration and Nationality Act § 212(d)(7), 8 U.S.C. § 1182(d)(7) (original version at ch. 477, § 212(d)(7), 66 Stat. 163, 188 (1952)) (emphasis added).

The procedure and method devised by the Attorney General for implementing section 212(d)(7) is to require *all persons,* aliens and United States citizens alike, seeking to enter the continental United States by air from the Virgin Islands to submit to inspection and examination by INS officers *as though they were traveling from a foreign country* to the United States:

> (a) In United States territories and possessions. In the case of any aircraft proceeding from . . . the United States Virgin Islands destined directly and without touching at a foreign port or place, to any other of such places, or to one of the States of the United States or the District of Columbia, the examination of the passengers and crew required by the Act may be made prior to the departure of the aircraft, and in such event, final determination of admissibility shall be made immediately prior to such departure. The examination shall be conducted in accordance with sections 232 [8 U.S.C. § 1222], 235 [8 U.S.C. § 1225], and 240 [8 U.S.C. § 1229a] of the Act[5] and 8 CFR parts 235 and 240. . . . When the foregoing inspection

Thomas checkpoint, the United States asked for additional time to determine whether it would assert an agency deliberative privilege on behalf of the INS. On June 7, 2002, the United States filed a sheaf of documents from the INS, thirty-three exhibits totaling 85 pages, without any commentary except to state that the "United States submits that the above documents do not bear on the issues before the Court." (Gov't Resp. to Apr. 16, 2002 Order, at 5.) In all this, the United States will not tell the Court when the checkpoint was established in its present form. Although I prefer to believe that the United States takes its positions with considered care, in this case, its refusal to aid in a full

and fair ventilation of this very serious issue has been frustrating, to say the least. I certainly hope that, after this ruling is issued, the United States does not then decide to do its homework and present evidence and raise issues on appeal it has never raised before me.

**5.** These sections together provide for the detention of aliens for physical and mental examination; inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing; and removal proceedings. *See* 8 U.S.C. §§ 1222, 1225, 1229a.

procedure is applied to any aircraft, persons examined and found admissible shall be placed aboard the aircraft, or kept at the airport separate and apart from the general public until they are permitted to board the aircraft. No other person shall be permitted to depart on such aircraft until and unless he or she is found to be admissible as provided in this section.

8 C.F.R. § 235.5(a) (footnote added).

The physical manifestation in the Virgin Islands of 8 C.F.R. § 235.5(a) is the non-border Departure Control immigration checkpoint at the Cyril E. King Airport in St. Thomas, as described by Donnie R. Smith, Area Port Director for St. Thomas. (*See* Apr. 4, 2002 Hr'g Tr. at 35–50 (testimony of Donnie R. Smith, Area Port Director) [hereinafter "Tr."].) The Departure Control Gate is the "primary" inspection area where all passengers are funneled like cattle through chutes to stand before uniformed INS inspectors from the Inspections Division, a part of the Office of Examinations in the INS structure.[6] Departure Control at the Cyril E. King Airport is located in a semi-secure area between the airline check-in counters and the airport security gate leading to all flights departing St. Thomas and bound for Puerto Rico and other United States destinations. Passengers encounter the checkpoint, along with a sign reading "United States Immigration Inspections," just after they have placed their checked luggage on a conveyor belt to be loaded on the aircraft. Stanchions guide the passengers in a line as they wait their turn to present themselves to an INS inspector for admission to the United States.

Passengers are directed by signs to wait behind the yellow line and to have their documents ready for the immigration inspector. Once summoned to come forward by a uniformed INS inspector, the passenger is guided down a narrow chute to the inspector seated at one of six stalls, where the passenger is detained until she satisfies the inspector that she is entitled to enter the continental United States or Puerto Rico. According to Area Port Director Donnie Smith, once the passenger is thus detained, the inspector first asks where the person is traveling, even though where she is going has absolutely nothing to do with the passenger's right to be admitted to the United States. (*See* Smith, Tr. at 43.)[7] The inspector next asks "What is your citizenship?" (*Id.* at 37–44.) Again according to Smith, a person claiming United States citizenship need not present any identification, although "ninety-nine percent of the people that come through ... walk up to the immigration inspectors and throw their passports right on the counter." (*Id.* at 44.) Mr. Smith further testified that if a person makes an oral declaration of U.S. citizenship, the inspector may "ask a question like, 'Well, where were you born?'" (*Id.* at 47.) If the inspector is satisfied that the person is a United States citizen, the traveler proceeds. (*Id.*) As already noted, the regulations provide that if the citizen "applicant for admission fails to satisfy the examining immigration officer that he or she is a U.S. citizen, he or she shall thereafter be in-

---

**6.** *See* 8 C.F.R. § 100.2(3) (setting forth the organization and functions of the various divisions of the Immigration and Naturalization Service).

**7.** Mr. Smith could give no creditable reason for asking this question. The best he could come up with is to make sure the passenger is not headed for the wrong gate, as only persons traveling to Puerto Rico or the continental United States need pass through the checkpoint. (*See* Smith, Tr. at 41.) Of course, each passenger has already had her ticket checked and destination confirmed by at least one airline or airport employee before being allowed to enter the area leading to the Departure Control Gate.

spected as an alien." 8 C.F.R. § 235.1(b). If the passenger is a foreign national, the inspector will look at the passport and "make sure the I–94 [Arrival/Departure Record] is in place" and "everything is in compliance" before allowing the person to proceed. (Smith, Tr. at 47.) [8]

If the traveler is unable to satisfy the primary inspector of her right to enter and be admitted to the continental United States, the inspector has the passenger taken to a secondary inspector at a room located approximately fifteen to twenty feet away from the primary inspection stalls. At secondary, the traveler is further questioned while her passport or name is run through the Treasury Enforcement Communications System [TECS] and various computer databases, including INS databases and perhaps a database that "cross-designates" with the FBI's National Crime Information System and detects any warrants or lookouts put in the system by Customs or INS. (See Smith, Tr. at 77–78.) [9]

Port Director Smith conceded that there are no written protocols or even guidelines for his inspectors to use in questioning the passengers or whether to require proof of citizenship from persons claiming to be U.S. citizens. (See id. at 45.) Indeed, Inspector Haywood testified that "[i]t was the practice of Immigration, my job, to ask for proper traveling documents that proved your citizenship, like the birth certificate or passport ... [I]t's up to the passengers or the traveling public to prove

to us that they are a U.S. citizen, if they say that they are." (See Haywood, Tr. at 111–12.) The record in this case demonstrates that, depending on their experience and training, inspectors simply go with their "gut" in deciding whether to demand documentation or ask further questions. (See Smith, Tr. at 46.)

All the circumstances of this case establish that the United States Immigration and Naturalization Service operates this Departure Control cattle chute as if it were examining persons at a border who seek entry into the United States, where detention and questioning without probable cause or reasonable suspicion are appropriate in the exercise of the sovereign's authority to control who comes across its international borders. See, e.g., United States v. Montoya de Hernandez, 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant...."). "Gut feelings" not amounting to reasonable suspicion, let alone probable cause, are proper at border examinations but not at an internal checkpoint within the United States, such as the St. Thomas airport Departure Control Gate. As evidenced by Haywood's testimony, inspectors at Departure Control do not make this crucial distinction. Indeed, the basic purpose of Part 235 is to prescribe the procedures for inspecting persons applying for admission to the United States from a foreign country. Al-

**8.** Although Mr. Smith asserted that the inspectors "are not reinspecting anybody," section 235.5 mandates that the procedures be the same as those under section 235 [8 U.S.C. § 1225] of the act, which corresponds to regulations for inspection. See 8 C.F.R. § 235.1(d)(1) ("Alien applicants for admission") ("Each alien seeking admission ... shall present whatever documents are required and shall establish to the satisfaction of the immigration officer that he or she is not

subject to removal ... and is entitled ... to enter the United States.").

**9.** At the time Pollard was seized, the primary inspectors also ran computer checks at their inspection booths. According to Port Director Smith, the practice was recently discontinued. (See Smith, Tr. at 77.) For purposes of deciding this motion, I will assume that such computer checks only take place at secondary inspection.

though the United States does not argue that there is an international border or its "functional equivalent" between the Virgin Islands and other United States jurisdictions for immigration purposes, it does contend that Congress has the constitutional authority to treat the Virgin islands "as if" it were a foreign country for purposes of inspecting travelers passing through the airport Departure Control checkpoint.

To determine the constitutionality of the procedures embodied in the St. Thomas airport Departure Control checkpoint, I first examine the origin and purpose of the statute and regulations which purport to authorize it. Subsection 212(d)(7) has its origin in section 1 of the Immigration Act of 1917, which provided in relevant part:

> [B]ut if any alien shall leave the Canal Zone or any other insular possession of the United States and attempt to enter any other place under the jurisdiction of the United States, nothing contained in this chapter shall be construed as permitting him to enter under any other condition than those applicable to aliens.

Immigration Act of 1917 § 1, 39 Stat. 874, 874 (1917).[10] The purpose of this provision was "to make it perfectly clear that the admission of an alien to the insular possessions does not privilege such alien to come to the mainland without examination." SEN.REP. No. 64-352, at 3 (1916). The report further stated that "[t]he necessity for the provision is the fact that aliens have been using the insular territory (particularly the Philippines) as a 'stepping stone' to the continent, avoiding close inspection by first securing admission to the Philippines and then coming 'coastwise' to the United States proper." Id. The lan-

guage found in section 1 of the 1917 Act provided the basis for the above-quoted subsection 212(d)(7) of the Immigration and Nationality Act of 1952, which applied at that time to the territories of Hawaii, Alaska, Guam, Puerto Rico, and the Virgin Islands. See Immigration and Nationality Act of 1952 § 212(d)(7), ch. 477, 66 Stat. 163, 188 (1952) (current version at 8 U.S.C. § 1182(d)(7)); see also U.S. ex rel. Alcantra v. Boyd, 222 F.2d 445 (9th Cir.1955) (setting forth the history of the 1952 provision).

The legislative history of the original and later enactments of subsection 212(d)(7) confirms that it was intended to cover those persons in the noncontiguous territories who either had never been subject to examination for admission to the United States or were inadmissible aliens who were nevertheless permitted to reside in a territory. See, e.g., 98 CONG.REC. 4405 (1952) ("Present restrictions covering the travel of aliens from the Territory of Hawaii to the United States were the outgrowth of the presence in Hawaii at the time of annexation in 1898 of a large number of aliens then ineligible to citizenship.") (statement of Rep. Farrington, in urging an amendment to the proposed 1952 Act that would have exempted Alaska and Hawaii, which were not yet States, from the restrictions imposed by section 212(d)(7)).

This original version of section 212(d)(7) conceivably could have had some application to the Virgin Islands from the time of its acquisition in 1917 from Denmark until Congress granted citizenship rights in 1927.[11] During this period, the former Danish citizens in the Virgin Islands were considered to be mere "nationals"[12] of the United States who were not necessarily

---

**10.** Although the United States was also ordered to provide supplemental briefing on the history and purpose of the preclearance checkpoints, it provided none of the legislative history or case authority set forth in this opinion.

**11.** See Act of February 25, 1927, Pub.L. No. 69-640, 44 Stat. 336 (1927).

**12.** "The status of such persons was considered analogous to that of the inhabitants of the Philippine Islands." William C. Boyer,

entitled to enter the continental United States under United States immigration law. At least during the period from 1917 to 1927, and perhaps into the early 1930s, the application of border-like admission requirements to persons traveling from the Virgin Islands to other United States jurisdictions may have had some rational basis, namely, to control the northward flow of non-citizen aliens legally present in the territory but not necessarily entitled to enter the continental United States.[13]

Today, however, there is no suggestion that the same purpose animates the current checkpoint. At the April 4th hearing, Area Port Director Donnie R. Smith provided what the United States has adopted as the current purpose of the checkpoint: "The Departure Control checkpoint is basically designed to prevent people who are illegally here in the U.S. Virgin Islands from gaining entry into either Puerto Rico or the continental United States." (*See* Smith, Tr. at 36) (as adopted by the United States in its written response to the Court's April 16, 2002 Order).

### 2. *The Arguments, Standard of Review, and Legal Analysis*

Pollard argues that the permanent immigration Departure Control checkpoint set up for detaining, inspecting, and examining each individual traveler boarding an airplane for a direct flight to other destinations within the United States violates her right to equal protection under the law. As a consequence, she asserts, any statements obtained from her through this dis-

criminatory and unconstitutional scheme cannot be used as evidence against her. According to Pollard, the checkpoint program's disparate impact on the mostly black population of the Virgin Islands cannot survive strict scrutiny. At the very least, she continues, the intentionally discriminatory statutory scheme has no rational basis.

The United States offers three procedural arguments in opposition: (1) Pollard has no standing to challenge the constitutionality of the statute because she is an alien illegally present in the United States; (2) Pollard has failed to carry her initial burden of showing that the challenged action or statute is discriminatory; and (3) even if the checkpoint operation constitutes an equal protection violation, suppression of evidence is not the proper remedy. Choosing to rest on these arguments and in the face of this Court's order requiring supplemental briefing, the United States refused to provide any evidence of, or rational explanation for, its differing treatment of persons traveling *from the Virgin Islands* to another location in the United States, as compared with persons traveling *from any other location within the United States* to any place in the United States, including the Virgin Islands.

### a. Procedural Arguments

■ Frankly, I cannot understand the United States' argument that an alien such as Pollard, who has been snared in the INS's facially discriminatory detention mechanism and is thus subject to incarcer-

---

*Commentary,* UNITED STATES VIRGIN ISLANDS: MAJOR POLITICAL DOCUMENTS 1671–1991, at 95 (1992).

**13.** Until 1932, persons born in the Virgin Islands who were not made citizens by the 1927 act because they resided in a foreign country at the time of the act's passage and who later attempted to return to the Virgin Islands were considered aliens. SEN.REP. No. 72–641 at 2–3 (1932) (describing the miscon-

ception of native Virgin Islanders living in foreign countries that they were made U.S. citizens in 1927 and recommending passage of a "short emergency immigration act" that would allow native Virgin Islanders a two-year period to return to the Virgin Islands without passport or non-immigrant visa to be naturalized as any other alien). *See* Act of June 28, 1932, Pub.L. No. 72–198, 47 Stat. 336 (1932).

ation if convicted of a felony, cannot directly challenge the discriminatory nature of that mechanism. Having been directly and personally affected by the suspect statutory and regulatory inspection procedures, Pollard obviously has the immediate personal interest and potential injury needed for "standing" to test the constitutionality of these procedures. *See, e.g., United States v. Payner,* 447 U.S. 727, 735, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) (holding, in the context of a motion to suppress for Fourth Amendment violation, that only the "victim of the challenged practices" can move to exclude the allegedly tainted evidence).

I do not understand the government to contend that Pollard is without the equal protection of laws once she was admitted to the United States at the St. Thomas airport. Even illegal aliens enjoy constitutional protection from invidious discrimination by the federal government once within the jurisdiction of the United States. *See Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); *Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) ("The Fifth Amendment, as well as the Fourteenth Amendment, protects [aliens] from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.") (citations omitted).

Within five years of the Virgin Islands becoming an appurtenance of the United States, the Court of Appeals for the Third Circuit in 1921 held that persons in the United States Virgin Islands are fully protected by the "fundamental right" of due process. *See Soto v. United States,* 1 V.I. 536, 545–46, 273 F. 628, 634 (3d Cir.1921). In 1968, Congress amended the Revised Organic Act of 1954 to make the Due Process Clause of the Fifth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment applicable in the Territory of the Virgin Islands, and further repealed all previously enacted laws of Congress that are inconsistent with those constitutional provisions:

> The following provisions of and amendments to the Constitution of the United States are hereby extended to the Virgin Islands to the extent that they have not been previously extended to that territory and shall have the same force and effect there as in the United States or in any State of the United States: ... the first to ninth amendments inclusive;[14] ... the second sentence of section 1 of the fourteenth amendment....
>
> All laws enacted by Congress with respect to the Virgin Islands ... which are inconsistent with the provisions of this subsection are repealed to the extent of such inconsistency.

Revised Organic Act of 1954 § 3 (added Aug. 23, 1968, Pub.L. 90–496, § 11, 82 Stat. 841) ["Rev.Org.Act"].[15]

---

**14.** The right to prosecution by grand jury indictment was specifically not extended to the Virgin Islands by this amendment.

**15.** 48 U.S.C. § 1561. As originally enacted and until amended in 1968, the Revised Organic Act only extended the guarantees of due process and equal protection of the laws to the enactments of the Virgin Islands Legislature. Act of July 22, 1954, ch. 558, § 3, 68

Stat. 497, 497 (1954) ("No law shall be enacted in the Virgin Islands which shall deprive any person of life, liberty, or property without due process of law or deny to any person therein equal protection of the laws.").

The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541–1645 (1995 & Supp.2001), *reprinted in* V.I.CODE ANN. 73–177, Historical Documents, Organic Acts, and

Subsequent decisions of the Court of Appeals and this Court have held that aliens in the Virgin Islands are guaranteed the equal protection of the laws. *See Chapman v. Gerard,* 456 F.2d 577, 577–78 (3d Cir.1972) ("An alien lawfully residing in the United States is entitled to equal protection under the Fourteenth Amendment.") (citing *Graham v. Richardson,* 403 U.S. 365, 371, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) and *Hosier v. Evans,* 314 F.Supp. 316, 319–20 (D.Vi.1970)). The *Chapman* court quoted from the Supreme Court's *Graham* opinion that " 'classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny.' " *Chapman,* 456 F.2d at 578 (quoting 403 U.S. at 372, 91 S.Ct. 1848). The Court of Appeals concluded that the discriminatory requirement that participants in a territorial scholarship fund be United States citizens was "not constitutionally sustainable as being rationally related to a legitimate state object or purpose." *Id.* at 579 (internal quotation marks omitted).

In the *Hosier* decision, cited with approval by the Court of Appeals in *Chapman,* this Court held that a local regulation permitting alien children present in the Virgin Islands as non-immigrant visitors to enroll in public school only if their admission did not increase the class size beyond certain limits violated the equal protection clause of the Fourteenth Amendment as an unreasonable and invidious discrimination against alien children. *See Hosier v. Evans,* 314 F.Supp. at 318–19 (noting that minor plaintiffs, non-resident aliens of non-immigrant status, and temporary visitors to Virgin Islands, nevertheless are "persons" within Equal Protection Clause of Fourteenth Amendment and have standing to challenge the regulation). Finally, this Court has also extended the equal protection of the laws to an illegal alien who, though not lawfully present in the Virgin Islands, may not be denied access to Virgin Islands' divorce courts solely because he is in violation of an immigration law. *See Williams v. Williams,* 328 F.Supp. 1380, 1384 (D.Vi. 1971) (noting that an alien may form the necessary intent to establish domicile in Virgin Islands even though illegally in Territory and therefore deportable). It is clear to me that Pollard, though an alien illegally present in the Virgin Islands, has "standing" to challenge, under principles of equal protection, the constitutionality of the discriminatory nature of the checkpoint mechanism itself.

■ I likewise reject the United States' blanket contention that it need not present any evidence of, or rational explanation for, the disparate treatment of the Virgin Islands and persons traveling from the Virgin Islands as compared with persons traveling from other locations in the jurisdiction of the United States to the Virgin Islands or any state or territory. I agree that, under ordinary equal protection analysis, the initial burden of showing intentional discrimination lies with the person challenging the action. In this case, however, Congress's intent to treat the Virgin Islands, and persons departing therefrom, differently from similar travelers in a State appears on the face of both the statute and regulation. Thus, at the very least, the statute and regulation must have a rational basis. *See Harris v. Rosario,* 446 U.S. 651, 651–52, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) ("Congress, which is empowered under the Territory Clause of the Constitution, U.S. Const., Art. IV, § 3, cl. 2, to 'make all needful Rules and Regulations respecting the Territory ... belonging to the United States,' may treat Puerto Rico differently from States so long as there is a rational basis for its ac-

U.S. Constitution (1995 & Supp.2001) (preceding V.I.Code Ann. tit. 1).

tions."). In any event, this issue was raised on the defendant's motion to suppress evidence obtained as the result of a warrantless seizure, which shifts to the United States the burden of establishing that its actions are constitutional. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995) ("[O]nce the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable."). Since the United States has supplied no rational basis for this intentionally discriminatory checkpoint, I reasonably can infer, and do conclude, that there is none.

 The United States' final argument is that suppression is not a remedy for an equal protection violation. I agree that Pollard cannot bring her equal protection claim under the Fourth Amendment by arguing that a seizure that is in violation of her right to equal protection is unreasonable under the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment."). In neither the *Whren* case nor any of the other decisions cited by the United States, however, has the Supreme Court or the Court of Appeals for the Third Circuit ruled out suppression of evidence as a remedy for an equal protection violation. *See United States v. Armstrong*, 517 U.S. 456, 461 n. 2, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (noting that the Supreme Court has "never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a court determines that a defendant has been the victim of prosecution on the basis of race"). The Supreme Court has not closed the door on an equal protection violation forming an independent basis for a motion to suppress a search or seizure that results from such discriminatory action. I therefore join the lower courts that have either assumed for the sake of argument that suppression can be a remedy, *see United States v. Chavez*, 281 F.3d 479, 486–87 (5th Cir.2002) (declining to reach the question whether suppression can be a remedy without evidence of discriminatory intent), or expressly held that suppression of evidence is a viable remedy for equal protection violations, *see United States v. Avery*, 137 F.3d 343, 355–58 (6th Cir.1997) (holding that equal protection principles provide an independent basis for a motion to suppress evidence, but finding that no equal protection violation occurred in that case).

To remedy an equal protection violation by suppressing the evidentiary fruit of that violation fully comports with the aim of the exclusionary rule as "a judicially created remedy designed to safeguard ... rights generally." *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). As with all violations of fundamental rights, the same concern arises "that no [person] is to be convicted on unconstitutional evidence." *Mapp v. Ohio*, 367 U.S. 643, 657, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). This is particularly true given the United States' position, supported by the Supreme Court in *Whren*, that Pollard may not bring her equal protection claim under her Fourth Amendment motion to suppress. It would be a toothless and hollow remedy indeed if the defendant can only bring a separate civil lawsuit to vindicate her right to due process and equal protection, as the United States asserts, while she is helpless in her criminal prosecution to move to suppress evidence extracted from her during a seizure that violates those due process and equal protection rights. Even if she were not convicted and deported before her civil case could be heard, what would her remedy be if she is successful? Money damages? An apology from the United States? To fol-

low what the Government of the United States suggests would mock the Constitution and its guarantees of due process and equal protection of the laws. I therefore expressly hold that suppression is a viable remedy for an equal protection violation.

### b. Standard of Review

Before addressing Pollard's claim that the immigration checkpoint at the Cyril E. King Airport defies even rational basis review, I comment on her claim that, because the Departure Control checkpoint has a disparate impact on the mostly black population of the Virgin Islands, the statute and regulation authorizing it must be examined with strict scrutiny. Although I can find no evidence in the record that the Departure Control Gate has a racially disparate impact on black Virgin Islanders, there is no denying that racial and cultural prejudice permeated the early years of, and still affects, the relationship of the United States with the Territory of the Virgin Islands.

It took over fifty years and three tries for the United States to successfully negotiate a treaty with Denmark to buy the islands.[16] Negotiations first began during the Civil War for the purchase of only St. Thomas and St. John as a strategically located naval station to protect the Atlantic coast. Completed in 1867, the negotiations almost broke down over Secretary of State William Seward's strong opposition to allowing the inhabitants of the Danish Virgin Islands the opportunity to vote on the transfer. Seward ultimately relented and the ensuing vote was in favor of the transfer. Although the Danish Rigsdag (parliament) promptly ratified the treaty, the United States Senate did not. During the next negotiation for all three main islands of St. Thomas, St. Croix, and St. John in 1902, and ultimately for the successful treaty in 1917, the anti-democratic opposition of the United States to a local plebiscite prevailed. Only the unratified 1867 agreement would have given Virgin Islanders the choice of becoming United States citizens. The 1902 version, which was approved by the United States Senate but was not ratified by Denmark, did not mention citizenship and would have given only the option of allegiance to the United States, with Congress deciding the islanders' political status and allocating their civil rights under American rule.

The negotiating position of the United States in both the 1902 and 1917 treaties undoubtedly stemmed from the acquisition of the several insular possessions, including the Philippines and Puerto Rico, at the Treaty of Paris at the end of the Spanish–American War in 1898. The Supreme Court also had fabricated out of whole cloth a brand new constitutional doctrine to accommodate these territories populated by non-white, non–Anglo–Saxon, non-European peoples. This is the racist doctrine of the "unincorporated" territory, judicially created in the infamous series of decisions known as the *Insular Cases*,[17]

---

**16.** The following general account of the negotiations and treaty is taken from the thoroughly documented and detailed account in WILLIAM W. BOYER, AMERICA'S VIRGIN ISLANDS, A HISTORY OF HUMAN RIGHTS & WRONGS 77–86 (1983).

**17.** Also known as the *Insular Tariff Cases*, nine Supreme Court cases decided in 1901 make up the core *Insular Cases*: *De Lima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Goetze v. United States*, 182 U.S. 221, 21 S.Ct. 742, 45 L.Ed. 1065 (1901);

*Goetze v. United States*, 182 U.S. 221, 21 S.Ct. 742, 45 L.Ed. 1065 (1901); *Dooley v. United States*, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901) (*Dooley I*); *Armstrong v. United States*, 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *Huus v. New York & Porto Rico Steamship Co.*, 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146 (1901); *Dooley v. United States*, 183 U.S. 151, 22 S.Ct. 62, 46 L.Ed. 128 (1901) (*Dooley II*); and *The Diamond Rings*, 183 U.S. 176, 22 S.Ct. 59, 46 L.Ed. 138 (1901). A second set

decided by the same the Supreme Court that gave us the equally racist but now thoroughly repudiated and overruled "separate but equal" doctrine.[18]

The unincorporation doctrine, simply put, holds that the Territorial Clause confers on Congress plenary power over territories that have not yet been "incorporated" into the United States. Under this rubric, the purely unilateral power of Congress is checked only by "fundamental restrictions," which apparently are not necessarily even expressed in the Constitution. As stated by Mr. Justice Brown, "[t]here are certain principles of natural justice inherent in the Anglo–Saxon character which need no expression in constitutions or statutes to give them effect or to secure dependencies against legislation manifestly hostile to their real interests." *Downes v. Bidwell,* 182 U.S. 244, 280, 21 S.Ct. 770, 45 L.Ed. 1088 (1901). Thus, according to the *Insular Cases,* those rights that we all grew up convinced were the fundamental bedrock of our system of justice, such as the right to trial by jury and the right to prosecution only upon indictment by grand jury, are mere "artificial or remedial rights" which those of us living in an unincorporated territory only deserve when Congress decides we are ready to handle them. *See Dorr v. United*

*ed States,* 195 U.S. 138, 149, 24 S.Ct. 808, 49 L.Ed. 128 (1904). Such "non-fundamental," "artificial," and "remedial" rights for citizens inhabiting an unincorporated territory can only be conferred by Congress.

By 1922, this racist reasoning had been fully adopted by the Court so that "[i]t is the locality that is determinative of the application of the Constitution . . . and not the status of the people who live in it." *Balzac v. Porto Rico,* 258 U.S. 298, 309, 42 S.Ct. 343, 66 L.Ed. 627 (1922) ("[A] citizen of the United States living in Porto Rico cannot there enjoy a right of trial by jury under the federal constitution" because such right is not a fundamental right.). Obviously, this simply can no longer be the case since a more enlightened Supreme Court has held that the right to trial by jury is such a fundamental right that it is incorporated in the Fourteenth Amendment's Due Process Clause and thereby applicable to the States. *See Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1958). Until *Duncan,* a jury trial was not considered a fundamental right constitutionally required in a state court.[19]

In case there is any doubt about the racism and cultural superiority that per-

---

of cases, decided between 1903 and 1914, further developed the *Insular Cases: Hawaii v. Mankichi,* 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903); *Gonzales v. Williams,* 192 U.S. 1, 24 S.Ct. 177, 48 L.Ed. 317 (1904); *Kepner v. United States,* 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1904); *Dorr v. United States,* 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); *Mendezona v. United States,* 195 U.S. 158, 24 S.Ct. 808, 49 L.Ed. 136 (1904); *Rassmussen v. United States,* 197 U.S. 516, 25 S.Ct. 514, 49 L.Ed. 862 (1905); *Trono v. United States,* 199 U.S. 521, 26 S.Ct. 121, 50 L.Ed. 292 (1905); *Grafton v. United States,* 206 U.S. 333, 27 S.Ct. 749, 51 L.Ed. 1084 (1907); *Kent v. People of Porto Rico,* 207 U.S. 113, 28 S.Ct. 55, 52 L.Ed. 127 (1907); *People of New York ex rel. Kopel v. Bingham,* 211 U.S. 468, 29

S.Ct. 190, 53 L.Ed. 286 (1909); *Dowdell v. United States,* 221 U.S. 325, 31 S.Ct. 590, 55 L.Ed. 753 (1911); *Ochoa v. Hernandez,* 230 U.S. 139, 33 S.Ct. 1033, 57 L.Ed. 1427 (1913); *Ocampo v. United States,* 234 U.S. 91, 34 S.Ct. 712, 58 L.Ed. 1231 (1914). The series culminated in 1922 with *Balzac v. Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922).

**18.** *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), *overruled by Brown v. Board of Educ.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

**19.** *See Palko v. Connecticut,* 302 U.S. 319, 324–25, 58 S.Ct. 149, 82 L.Ed. 288 (1937).

meate these thoroughly ossified cases that embody the intrinsically racist imperialism of a previous era of United States colonial expansionism, I quote directly from the *Insular Cases:*

> If those possessions are *inhabited by alien races,* differing from us in religion, customs, laws, methods of taxation, and modes of thought, the administration of government and justice, according to Anglo–Saxon principles, may for a time be impossible. . . .

*Downes v. Bidwell,* 182 U.S. at 286–87, 21 S.Ct. 770 (Brown, J.) (emphasis added).

> We are also of the opinion that the power to acquire territories by treaty implies not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants, and what their status shall be in what Chief Justice Marshall termed the 'American Empire'. There seems to be no middle ground between this position and the doctrine that if these inhabitants do not become, immediately upon annexation, citizens of the United States, their children thereafter born, *whether savages or civilized,* are such, and entitled to all the rights, privileges and immunity of citizens. If such be their *status,* the consequences will be extremely serious.

*Id.* at 279, 21 S.Ct. 770 (Brown, J.) (underline emphasis added; italic emphasis in original).

On the right to jury trial in the Philippines, the Court observed:

> If the right to trial by jury were a fundamental right which goes wherever the jurisdiction of the United States extends, or if Congress, in framing laws for outlying territory belonging to the United States, was obliged to establish that system by affirmative legislation, it would follow that, no matter what the needs or capacities of the people, trial by jury, and in no other way, must be forthwith established, although the result may be to work injustice and provoke disturbance rather than to aid the orderly administration of justice. If the United States, *impelled by its duty or advantage, shall acquire territory peopled by savages,* and of which it may dispose or not hold for ultimate admission to statehood, if this doctrine is sound, it must establish there the trial by jury. To state such a proposition demonstrates the impossibility of carrying it into practice.

*Dorr v. United States,* 195 U.S. at 148, 24 S.Ct. 808 (emphasis added).

This, then, exemplified the culturally superior and racially prejudiced attitude with which negotiations resumed for the purchase of the Danish West Indies in the early 1900s, motivated by the opening of the Panama Canal, the outbreak of World War I, and concern that Germany might gain a naval port in the Caribbean by treaty or conquest of Denmark. When Denmark was not receptive to the renewed approach in 1915 of President Wilson's Secretary of State, Robert Lansing, the United States threatened to occupy the Islands militarily "if Denmark voluntarily, or under coercion, transferred title to the islands to another European power, which would seek to convert them into a naval base."[20] Acceding to the threat, the Danes reopened negotiations and again wanted to allow the islands' inhabitants to vote on the transfer, requesting as well provisions conferring United States citizenship on the Islanders and granting free trade between the Islands and the continental United States. Lansing firmly rejected all these conditions.[21] A treaty was

---

**20.** Robert Lansing, "Drama of the Virgin Islands Purchase," *The New York Times Magazine,* July 19, 1931, vol. 80, sec. 5, p. 4, *quoted in* Boyer, *supra* note 13, at 83.

**21.** In a June 2, 1916 telegram, for example, Secretary Lansing advised that "Danish West Indians ... will be regarded as nationals of the United States and entitled to its full pro-

signed without these stipulations, and the Senate promptly gave its advice and consent. *See* Convention Between the United States and Denmark, 39 Stat. 1706 (available at V.I.Code Ann. 27–38, Historical Documents, Organic Acts, & U.S. Constitution (1995) (preceding V.I.Code Ann. tit. 1) ) ["Convention"]. After a national plebiscite in Denmark, both of its houses approved the transfer and the King ratified the Treaty on December 22, 1916, and President Wilson ratified the Treaty on January 16, 1917. The formal transfer took place on March 31, 1917.

The proposed 1867 Treaty would have given Virgin Islanders the choice of becoming citizens *of* the United States,[22] whereas the 1917 Treaty gave them the option of accepting "citizenship *in* the United States." *See* Convention art. 6, 39 Stat. 1706, 1712. This change of one little word—two letters: "of" to "in"—allowed Acting Secretary of State Frank Polk in 1920 to declare that Virgin Islanders "have American nationality and are entitled to the protection of the government, but have no civil and political status of citizens of the United States."[23] Without even getting into the autocratic rule of the Virgin Islands from 1917 to 1931 by a racially segregated United States Navy, which is universally contemned as thoroughly racist, it would seem that the

conclusions are inescapable . . . that the United States induced Denmark to sell the Islands under a threat of force, that it took possession of the Islands without gaining the consent of their inhabitants, and that it deceived them into believing they were being accorded American citizenship when in fact the United States intended to deny them that status.[24]

The judiciary has followed suit. Even though not one of the *Insular Cases* touched on the nature of the relationship of the Virgin Islands with the United States, the Court of Appeals for the Third Circuit in 1921 concluded that the Virgin Islands were an unincorporated territory to which the *Insular Cases* applied. *See Soto v. United States*, 1 V.I. 536, 544–45, 273 F. 628, 633 (3d Cir.1921).[25] The *Soto* court concluded that "[t]erritory acquired by treaty is regarded as territory appurtenant to the United States, but not as a part of the United States" to which "artificial or remedial rights" such as "the right of presentment by grand jury and of trial by jury" do not automatically apply. Even though persons in the United States Virgin Islands were otherwise treated as aliens, the Court of Appeals held that they are nevertheless protected by the "fundamental right" of due process.

> In these [*Insular*] cases the Supreme Court clearly expressed the opinion, not

---

tection, and will receive every possible political liberty." Charles C. Tansill, The Purchase of the Danish West Indies 491–92 (1932).

**22.** *See* Treaty Between the United States and His Majesty the King of Denmark, Stipulating for the Cession of the Islands of St. Thomas and St. John, in the West Indies art. III, *reprinted in* 2 Unperfected Treaties of the United States of America 1776–1976, at 284–85 (Wiktor ed. 1976) ("[T]hose who shall remain in the said islands after the expiration of that term without having declared their intention to retain their natural allegiance shall be considered to have elected to become citizens of the United States.").

**23.** William C. Boyer, *Commentary*, United States Virgin Islands: Major Political Documents 1671–1991, at 95 (1992) (internal quotation omitted).

**24.** Boyer, *supra* note 16, at 86.

**25.** The Court of Appeals arrived at this conclusion with no analysis of the terms of the Treaty of 1917 and by ignoring whether the Organic Act of March 3, 1917, organized the government for the new territory and thereby made the Constitution applicable. This is a discussion that is better saved for another day, however.

on the point of the decisions, to be sure, but as a logical corollary, that *even if the people of such territories* —not being possessed of the political rights of citizens—*are regarded as aliens*, they are entitled in the spirit of the Constitution to be protected in life, liberty and property and not to be deprived thereof without due process of law.

*Id.* at 545–46, 273 F. at 634 (emphasis added).[26] As we have seen, the United States still regards all people of the Virgin Islands as aliens when they travel to the continental United States.

Without any further analysis or consideration of changed circumstances, the Supreme Court and courts of appeals have continued, in knee-jerk fashion, to reiterate and apply this wholly judge-crafted and obviously race-based doctrine to justify the unequal treatment of citizens based solely upon where they live in the United States. *See, e.g., Califano v. Torres,* 435 U.S. 1, 2 n. 4, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978) (citing *Downes v. Bidwell* and *Balzac* for the proposition that not all federal laws extend to Puerto Rico due to its "relationship to the United States that has no parallel in our history") (internal quotations omitted); *Granville–Smith v. Granville–Smith,* 349 U.S. 1, 75 S.Ct. 553, 99 L.Ed. 773 (1955) (applying the doctrine of unincorporated territories to void the divorce law passed by the Virgin Islands Legislative Assembly under the Organic Act of 1936); *United States v. Hyde,* 37 F.3d 116, 120 (3d Cir.1994) (citing *Downes v. Bidwell* as authority for Congress to create a one-way "customs border" between the Virgin Islands and the rest of the United States to conduct custom searches there without probable cause).

Indeed, the Court of Appeals as recently as January of this year, relied on the *Insular Cases* to rule that, "[a]s a preliminary matter, we note that residents of the Virgin Islands have no constitutional right to indictment by a grand jury." *United States v. Ntreh,* 279 F.3d 255, 256 (3d Cir.2002).

I touch on one last point of double discrimination by Congress against the Virgin Islands and its residents. In 1966, Congress made the federal district court of Puerto Rico an Article III court whose judges serve during good behavior [27] but left the District Court of the Virgin Islands as an Article IV court whose judges now serve ten-year terms. This is double discrimination because Congress not only treats the Virgin Islands differently from all the States but also treats it differently from our fellow unincorporated territory of Puerto Rico, a differing treatment for which there is absolutely no conceivable rational basis. The federal courts for both territories were set up by Congress under its authority to govern United States possessions granted by Article IV, Section 2, of the Constitution. U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States. . . ."). The Foraker Act of 1900 created the district court of Puerto Rico. *See* Foraker Act, ch. 191, § 34, 31 Stat. 77, 84 (1900). The 1936 Organic Act set up the District Court of the Virgin Islands. *See* Organic Act of 1936 ch. 699, § 25, 49 Stat. 1807, 1813 (1936). The terms of the judges of both courts started out at four years. *See* Foraker Act § 34, 31 Stat. at 84; Organic Act of 1936 § 26, 49 Stat. at

---

**26.** Even though the Virgin Islands were from the outset treated by the Court of Appeals as an unincorporated territory, it was not until 1954 that Congress formally declared the Virgin Islands to be an "unincorporated" territo-ry of the United States. *See* Rev.Org.Act § 2(a), 48 U.S.C. § 1541(a).

**27.** *See* Act of Sept. 12, 1966, Pub.L. 89–571, 80 Stat. 764.

1813. Just as did the District Court of Puerto Rico in 1966, this Court has all the jurisdiction and powers of an Article III United States district court in any State. *See, e.g., Walker v. Government of the Virgin Islands,* 230 F.3d 82, 86 (2000) ("[Section] 22, as amended, affirmatively bestows on the District Court of the Virgin Islands the entire jurisdiction of a[n Arti-cle III] District Court of the United States."); *see also* Rev.Org.Act § 22(a), 48 U.S.C. § 1612(a).[28] The District Court of the Virgin Islands nevertheless remains an Article IV court whose judges are without the guarantees of judicial independence. Yet, the Congress brought the equivalent court in Puerto Rico under Article III in 1966, thirty-six years ago.[29]

28. When first enacted, section 22 of the Revised Organic Act of 1954 provided:

> The District Court of the Virgin Islands shall have the jurisdiction of a district court of the United States, regardless of the sum or value of the matter in controversy. It shall have general jurisdiction in all other causes in the Virgin Islands, exclusive jurisdiction over which is not conferred by this Act upon the inferior courts of the Virgin Islands.

Act of July 22, 1954, ch. 558, § 22, 68 Stat. 497, 506 (1954). In 1984, Congress amended section 22 so that it now reads: "The District Court of the Virgin Islands shall have the jurisdiction of a District Court of the United States, including, but not limited to, the diversity jurisdiction provided for in section 1332 of Title 28, and that of a bankruptcy court of the United States...." 48 U.S.C. § 1612(a).

29. The need for the constitutional guarantee of judicial independence is as great for the judges of the District Court of the Virgin Islands as it is for judges in any State or territory, especially in politically sensitive controversies and emotionally charged cases. The threat to independent judicial decision-making is real. Mr. Justice Douglas reminded of the continuing importance of Article III protections:

> The safeguards accorded Art. III judges were designed to protect litigants with unpopular or minority causes or litigants who belong to despised or suspect classes. The safeguards surround the judge and give him a measure of protection against the hostile press, the leftist or rightist demands of the party in power, the glowering looks of those in the top echelon in whose hands rest the power of reappointment.
> ...
> Without the independence granted and enjoyed by Art. III judges, a federal judge could more easily become the tool of a ravenous Executive Branch.

*Palmore v. United States,* 411 U.S. 389, 412–13, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973) (Douglas, J., dissenting) (footnotes omitted). Deciding cases involving the United States Government and its officials and the Virgin Islands Government and its officials is difficult enough in itself, without the added factor of the possible impact such a decision may have on the judge's continued tenure or chances of reappointment. The report of Congress accompanying the act giving lifetime tenure to federal judges in Puerto Rico could just as well describe the judges of the District Court of the Virgin Islands.

> There does not appear any reason why the U.S. district judges for the district of Puerto Rico should not be placed in a position of parity as to tenure with all the other Federal judges throughout our judicial system. Moreover, Federal litigants in Puerto Rico should not be denied the benefit of judges made independent by life tenure from the pressures of those who might influence his chances of reappointment, which benefits the Constitution guarantees to the litigants in all other Federal courts. These judges ... have and will have the exacting same heavy responsibilities as all other Federal district judges and, therefore, they should have the same independence, security, and retirement benefits to which all other Federal district judges are entitled.

S.Rep. No. 1504, 89th Cong., 2d Sess. at 2–3 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2787–88 (quoting H.R.Rep. No. 135, 89th Cong., 1st Sess.).

It is not as if Congress has had no opportunity to correct this instance of disparate treatment of the Virgin Islands. Although the Honorable Donna Christian–Christensen, the elected *Virgin Islands Delegate to Congress,* cannot vote on the floor of the House, she has twice introduced a bill "[t]o establish the District Court of the Virgin Islands as a court under article III of the United States Constitution." H.R. 3642, 105th Cong. (1998); H.R.

In 1994, the Court of Appeals for the Third Circuit reaffirmed the *Insular Cases* when it held in *United States v. Hyde* that routine, warrantless "customs border" searches by customs agents at the Cyril E. King Airport in the Virgin Islands are reasonable under the Fourth Amendment. *See* 37 F.3d 116 (3d Cir.1994). I cite this case as further evidence of the continued application of the discriminatory unincorporation doctrine to the Virgin Islands, and I would further point out that *Hyde* is factually inapposite in this case because the Congress has always included the Virgin Islands within the United States for immigration purposes, but not for customs purposes. Congress established the Virgin Islands as a separate customs territory in the 1917 Organic Act and has continued to exclude the Virgin Islands from the statutory definition of the United States for purposes of customs duties.

> Consistent with the approach of imposing duty on goods leaving the Virgin Islands for the mainland, an approach which remains in place today, the Tariff Act of 1930 specifies that the United States customs territory excludes the Virgin Islands. For purposes of that general tariff statute, "[t]he term 'United States' includes all Territories and possessions of the United States except the Virgin Islands...." 19 U.S.C. § 1401(h).

*Hyde*, 37 F.3d at 121. According to *Hyde*, Congress can exercise its power under Article IV and the *Insular Cases* to establish an "internal border" only for customs purposes for commerce from an unincorporated territory of the United States to the rest of the United States. This distinction was carried into the regulation and statute authorizing customs preclearance border inspection and search of passengers and baggage on flights bound directly for the United States from the Virgin Islands. *See* 19 C.F.R. § 122.144(b); 19 U.S.C. § 1467; *see also Hyde*, 37 F.3d at 120–21. While the Court of Appeals agreed with me that this "internal customs border search" differed from the Supreme Court's decisions on warrantless customs searches at international borders, the *Hyde* court somehow was nevertheless able to find that the rationale of those international border cases supported warrantless searches at St. Thomas's one-way customs border. *See Hyde*, 37 F.3d at 122.

Whatever else it may endorse, *Hyde* does not stand for the proposition that there is an "internal" border between the Virgin Islands and the continental United States for immigration purposes. *See id.* (acknowledging that "the authority of the United States ... to exclude people ... at places other than its international borders is ... substantially restricted by the Constitution"). To its credit, the United States agrees and makes no argument that an international border or its "functional equivalent" exists between the Virgin Islands and other U.S. jurisdictions for immigration purposes.

In sum, all three branches of the United States government—the Legislative Branch, the Executive Branch and the Judicial Branch—believe that the United States may treat persons residing in or visiting the Territory of the United States differently from persons in a State. Having fully set out the origins of the contin-

---

2011, 106th Cong. (1999). In addition, the Judicial Conference of the United States, acting through its Administrative Office of the United States Courts, included a proposal to establish Article III courts in the Virgin Islands and the Northern Mariana Islands in its request for the appointment of additional federal judges introduced in the Senate in 2000. S. 3071, 106th Cong. § 4 (2000) (read twice and referred to the Committee on the Judiciary). No meaningful action was ever taken on any of these proposals in the House or in the Senate.

ued disparate treatment, I am inclined to view as not so far-fetched Pollard's allegation that the implementation of section 212(d)(7) and 8 C.F.R. § 235.5, which are facially neutral in terms of race, nevertheless has a racially disparate impact as applied or is otherwise racially motivated. If I view the regulation as part and parcel of an undeniably racist doctrine, for which the territorial distinction is little more than a proxy for race, then strict scrutiny review of the statute could very well be warranted. The conclusion is simply unavoidable that the origin and structure of the unincorporation doctrine resonate with a racist ideology that has never had a place in our democratic system and its axiom that all persons are equal in the eyes of the law. Moreover, through its exclusive application to insular territories with populations that are largely non-white, the impact of the doctrine and any laws made or upheld pursuant to it is necessarily racially disparate.

■ Rail as I may against the *Insular Cases* and their progeny, however, this federal trial court is bound by the view of the Supreme Court and the United States Court of Appeals for the Third Circuit that disparate treatment based on a territory's unincorporated status need only have a basis in reason. *See Harris v. Rosario,* 446 U.S. at 651–52, 100 S.Ct. 1929; *see*

*also Government of the Virgin Islands v. Dowling,* 866 F.2d 610, 615 (3d Cir.1989). Thus, I am forced to reject the defendant's request for strict scrutiny review of the statute and regulation.

### c. Legal Analysis

■ Even applying the lesser standard of rational basis review, the Departure Control checkpoint cannot survive scrutiny. I can find no conceivable basis in reason for the continued application of section 212(d)(7) and 8 C.F.R. § 235.5 to the Virgin Islands. Whether by choice or because it has nothing to present, the United States has provided no reasonable explanation for singling out the Virgin Islands for its special permanent, internal, non-border immigration Departure Control checkpoint, where the INS subjects all persons to suspicionless seizure until they prove their right to be in the United States.[30] The United States' argument that there is no disparate treatment here because every such air traveler leaving the Virgin Islands is subjected to the same mistreatment at the Departure Control Gate focuses too narrowly. The relevant comparison is between persons traveling on flights within the United States originating in the Virgin Islands and persons traveling on flights within the United States originating in any State or the District of Columbia.

**30.** As discussed *infra,* INS Supervisory Special Agent Todd Johnson testified that there are reports that two to three boats with undocumented aliens land in St. Thomas or St. John every day, and that the Departure Control checkpoint serves as a "primary offense" in apprehending illegal aliens as they attempt to leave the Virgin Islands for other parts of the United States. (*See* Johnson, Tr. at 134, 152.) Again to its credit, the United States does not rely on this undocumented, unsupported, and exaggerated opinion testimony as the reason for the Departure Control checkpoint. If it did put forth that persons come to the Virgin Islands in the hope of moving on to some other point in the United States as the

official reason for the preinspection checkpoint, the United States would have to explain why these conditions are more true for the Virgin Islands than any other place in the United States, in particular, Alaska, Hawaii, Puerto Rico, southern Florida, Texas, California or any other accessible border state. The record confirms that the United States chooses to seal off the "outgoing" border of the Virgin Islands, forcing every person present here who would like to leave to "chat" for a few minutes with uniformed officials regarding their citizenship, rather than even try to use other more appropriate tools to prevent persons from gaining illegal entry at the Virgin Islands' physical international border.

Nothing can more conclusively confirm the lack of any rational basis than the historical fact that political subdivisions of the United States, which are subject to the preinspection requirement of section 212(d)(7) and 8 C.F.R. § 235.5 while a territory, automatically come out from under the burden of the statute and regulation upon being accepted into the Union as a State. Thus, Congress immediately amended the law to remove the new States of Hawaii and Alaska from such immigration inspections of passengers flying from Honolulu to Los Angeles or from Juneau to Seattle.[31] Nothing in the legislative history of Congress's amendments to section 212(d)(7) even hints at any change in conditions at the international borders surrounding Alaska and Hawaii or of any diminished need for vigilance against illegal aliens using either Hawaii and Alaska as a "stepping stone" into the continental United States. Hawaii was and is still an island system in the Pacific Ocean some 2100 miles from California, and Alaska was and is still separated from the continental United States by the sovereign nation of Canada.[32] The avowed need for preinspection "to prevent people who are illegally here in the U.S. ... from gaining entry into ... the continental United States"[33] apparently just magically disappeared down the White Rabbit's large rabbit-hole once Hawaii and Alaska became States.

A departure checkpoint such as the one established at the Cyril E. King Airport, which requires every passenger to stop and be examined, is not employed in Hawaii, Alaska, any other State of the Union, or the District of Columbia. Even though section 212(d)(7) and 8 C.F.R. § 235.5 equally mandate the preinspection of passengers flying from Puerto Rico to the Virgin Islands or the mainland, the United States has chosen not to subject Puerto Ricans to such a cattle chute Departure Control checkpoint.[34] In point of fact, there is absolutely no check by INS of passengers flying from Puerto Rico into the Virgin Islands.

Before me is yet another example of a federal statute and regulation that invidiously discriminate against the discrete and insular minority population of the United States Virgin Islands, a population that lacks any meaningful or significant access to the representative process. It is further evidence that the Government of the United States believes it has no obligation to afford the Territory of the Virgin Islands and all who live or visit therein, noncitizen and citizen alike, the same equal protection of the laws that the United States accords to non-citizens and citizens in each of the fifty States and the District of Columbia. The only relevant distinction is that the United States citizens who reside in the fifty States have a right to vote for those who make and enforce the federal laws that directly affect them. Even the United States citizen residents of the District of Columbia have the right to vote for President and Vice–President. This

**31.** See Lopez v. Aran, 844 F.2d 898, 913 (1st Cir.1988) (Torruella, J., dissenting) (referring to the "eloquent fact that Hawaii and Alaska have, since gaining access to the political processes, been excluded from the challenged 'protocol' ").

**32.** Consistent with the unwillingness of the United States to assist the Court in deciding this case, the United States provided no supplemental briefing on the rationale for amending the law and regulation to remove Alaska and Hawaii from their coverage upon achieving statehood, although ordered to do so on April 16, 2002.

**33.** (See Smith, Tr. at 36.)

**34.** Although the United States steadfastly maintains that the current protocol in Puerto Rico is irrelevant to the resolution of this matter, the record clearly suggests that the preinspection protocol in Puerto Rico is "random." (See Tr. at 97, 191, 206.)

invidious distinction, of course, is anything but a rational basis for the disparate treatment by the INS of persons residing in or visiting the Virgin Islands. As stated by the President's Commission on Immigration and Naturalization soon after the enactment of section 212(d)(7) in 1952, "[t]his discrimination against the inhabitants of the possessions of the United States seems to be unsound." *Whom Shall We Welcome: Report of the President's Commission on Immigration and Naturalization* 184 (1953) (adding that the "imposition of unwarranted discrimination seems directly opposed to the national interest and security").

In sum, Congress continues without any rational basis to apply the preinspection requirement of section 212(d)(7) and 8 C.F.R. § 235.5 to the remaining territories of the Virgin Islands, Puerto Rico, and Guam, and the Executive Branch, through the Immigration and Naturalization Service, has singled out the Territory of the Virgin Islands for more refined discrimination through the unreasonably intrusive inspection scheme of the Departure Control cattle chute previously described.[35] Section 212(d)(7), 8 C.F.R. § 235.5, and the Departure Control Gate or checkpoint unconstitutionally discriminate against visitors to and residents of the Virgin Islands as a class. Virgin Islanders were treated as aliens in 1921;[36] Virgin Islanders are still treated as aliens in 2002. On their faces, section 212(d)(7) and 8 C.F.R. § 235.5 violate the equal protection guarantees of the Fourteenth and Fifth Amendments. Accordingly, Pollard's statement obtained as a result of the unconstitutional seizure of her person at the Departure Control checkpoint as authorized by the statute and regulation must be suppressed.

## B. Fourth Amendment

Pollard further argues that the permanent Departure Control checkpoint operated by the INS at the St. Thomas airport to detain and inspect each individual traveler before permitting her to board a direct flight to other destinations within the United States violates the Fourth Amendment's protection from unreasonable search and seizure. Her primary contention is that the mandatory, wholly suspicionless stop of each traveler at the Departure Control checkpoint, where the traveler must satisfy the INS inspector of her legal immigration status and/or right to be admitted to the United States, does not satisfy the standards the Supreme Court has set down for such internal, non-border immigration checkpoints. *See United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Pollard asserts that our Departure Control Gate constitutes an objectively intrusive seizure that is neither necessary because of difficulty in patrolling the Virgin Islands' international border nor effective at apprehending persons on St. Thomas whose presence is in violation of United States immigration laws. While the United States agrees that the Departure Control checkpoint is not at a border or its functional equivalent and that the seizures effected there are not warrantless border seizures, the prosecution nevertheless contends that the seizures at the permanent immigration checkpoint are constitutional under the Supreme Court's decision in *Martinez–Fuerte*. The United States further cites what it contends is an analogous situation in which the First Circuit Court of Appeals, for the most part, approved an airport immigration checkpoint at the international airport at Isla Verde, Puerto Rico. *See Lopez v. Aran*, 844 F.2d 898 (1st Cir.1988).

---

**35.** How the INS may treat passengers flying from Guam is not before me.

**36.** *Soto v. United States*, 1 V.I. at 545–46, 273 F. at 634.

No one disputes that the mandatory stop of each traveler at Departure Control is a "seizure" for Fourth Amendment purposes. *See Martinez–Fuerte*, 428 U.S. at 555, 96 S.Ct. 3074 ("It is agreed that checkpoint stops are 'seizures' within the meaning of the Fourth Amendment."); *Lopez v. Aran*, 844 F.2d at 906 ("Checkpoint stops are indubitably 'seizures' within the meaning of the fourth amendment...."). The particular facts of each case, of course, must be examined to make sure that the precise scenario passes muster under the Fourth Amendment. *See Martinez–Fuerte*, 428 U.S. at 565, 96 S.Ct. 3074 ("[O]ur holding today is limited to the type of stops described in this opinion."); *Lopez v. Aran*, 844 F.2d at 906.

As already noted, persons within the Virgin Islands are fully protected by the fundamental rights set forth in the Fourth Amendment. Rev.Org.Act. § 3, 48 U.S.C. § 1561. Further, there is no "intermediate" or "internal" border between an unincorporated territory of the United States and the rest of the United States for immigration purposes. *See Torres v. Puerto Rico*, 442 U.S. 465, 473, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979) (holding that there is no "intermediate border" between Puerto Rico and the continental United States for Fourth Amendment purposes); *Lopez v. Aran*, 844 F.2d at 902 (no "internal" immigration border between Puerto Rico and the continental United States); *Savoretti v. Voiler*, 214 F.2d 425, 427–28 (5th Cir. 1954) (no "entry" for immigration purposes when a resident alien returns to the continental United States from Puerto Rico); *see also* 8 U.S.C. § 1101(36) (defining the U.S. Virgin Islands as a "state" for immigration purposes); *id.* § 1101(38) (defining the term " 'United States,' ... when used in a geographical sense" to include the U.S. Virgin Islands); *United States v. Hyde*, 37 F.3d 116, 120–21 (3d Cir.1994)

(Even if Congress can create an "internal border" between the unincorporated territory of the Virgin Islands and the continental United States for customs purposes, it has not and cannot create such an "internal immigration border" between the Virgin Islands and the continental United States.).[37]

■ Contrary to the suggestion of the United States, the mere fact that Congress has authorized suspicionless, warrantless seizures at an airport departure checkpoint in order to "preinspect" all travelers does not necessarily mean that the operation of the checkpoint is constitutional under the Fourth Amendment. It hardly deserves repeating that Congress is not free to authorize a checkpoint whose operation violates an individual's right to be free from unreasonable search or seizure. *See Almeida–Sanchez v. United States*, 413 U.S. at 272, 93 S.Ct. 2535 ("It is clear, of course, that no Act of Congress can authorize a violation of the Constitution."). To determine the constitutionality of any seizure, I must weigh "[1] the gravity of the public interest concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty." *See Michigan v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (clarifying that the applicable test for fixed traffic checkpoints is derived from *Martinez–Fuerte* and *Brown v. Texas*); *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (holding that application of statute to detain Brown and require him to identify himself violated Fourth Amendment because officers lacked any reasonable suspicion to believe he was committing or had committed a crime).

While I have already ruled that the statute and regulation on which this check-

---

**37.** *See also* discussion of *Hyde, supra* Part II.b.2.

point is based violate the equal protection provisions of the Fifth and Fourteenth Amendments, it is nonetheless useful to analyze this checkpoint under *Martinez–Fuerte*, which the parties agree sets forth the appropriate Fourth Amendment standard applicable to a permanent, non-border, internal immigration checkpoint, such as the Departure Control Gate. *See Lopez v. Aran*, 844 F.2d at 902, 903 n. 6. (1st Cir.1988) (concluding that *Martinez–Fuerte* presents the most analogous situation for purposes of determining the validity of the much less intrusive airport immigration "checkpoint" in Puerto Rico). I have fully described in the preceding equal protection discussion the origin, purpose, and operational details of the Departure Control checkpoint currently in place at the Cyril E. King airport. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 47, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (directing courts to consider the primary programmatic purpose of a checkpoint as relevant to determining its compatibility with the Fourth Amendment). Having concluded that the primary programmatic purpose of a section 235.5 checkpoint originally was to inspect persons who may have been legally present in a territory but whose admissibility to the United States had not yet been determined and that this original purpose no longer obtains, I move on to the *Martinez–Fuerte* analysis.

In *Martinez–Fuerte*, the Supreme Court approved the use of permanent automobile checkpoints situated well inside the United States' international border with Mexico for the purpose of stopping traffic to inspect vehicles and inquire about the occupants' immigration status. *See* 428 U.S. at 561, 96 S.Ct. 3074. At checkpoints in both California and Texas, Border Patrol agents conducted these systematic inquiries with-

out being required to articulate any individualized suspicion that an occupant was an illegal alien or one subject to deportation. Although the Supreme Court acknowledged that the checkpoint stops were "seizures" within the meaning of the Fourth Amendment, the Court weighed the competing public and private interests at stake to conclude that the checkpoint seizures were nevertheless constitutional. *See id.* As determined by the Supreme Court, the intrusion on the privacy interests of the motoring public was "minimal," while the purpose of the checkpoint was "legitimate and in the public interest" in light of the "formidable law enforcement problem" presented by the northbound flow of illegal aliens across the vast Mexican border. *Id.*

In balancing the competing interests at stake, the *Martinez–Fuerte* Court emphasized both the necessity for the checkpoint and its effectiveness at apprehending persons whose presence in the United States violates U.S. immigration laws. First, the Court noted the "formidable law enforcement problem" presented by surreptitious entries across the nearly 2000–mile–long border with Mexico, as well as the relative ease of entering at a port-of-entry with falsified "border passes," which, at the time of the decision in *Martinez–Fuerte*, authorized the admission of "nonimmigrant visitors" without additional documentation to travel within twenty-five miles of the border for less than seventy-two hours. *See id.* at 552 n. 7, 96 S.Ct. 3074 (citing 8 C.F.R. § 212.6 (1976)). In discussing the effectiveness of the checkpoints, the Court noted that during each year, approximately 10 million cars passed through the San Clemente checkpoint, and that during calendar year 1973, 17,000 illegal aliens were apprehended there.[38] *Id.* at 554, 96 S.Ct.

---

**38.** The Supreme Court considered each vehicle that passed through the checkpoint during its operation to have been seized for Fourth

Amendment purposes. *See Martinez–Fuerte,* 428 U.S. at 556, 96 S.Ct. 3074 ("It is agreed

3074. During an eight-day period in 1974, 725 deportable aliens were found in 171 vehicles out of the roughly 146,000 vehicles that passed through the checkpoint during that period.[39] *Id.* The Court also noted that, given the heavy flow of traffic, it would be "impractical" to require reasonable suspicion based on a "particularized study of a given car" to determine whether it carried illegal aliens. *Id.* at 557, 96 S.Ct. 3074. Although the reduced level of "one's expectation of privacy in an automobile and of freedom in its operation" ordinarily still requires probable cause for the search of a vehicle,[40] and at least reasonable suspicion for its seizure,[41] the Court relaxed this standard at fixed vehicle im-

migration checkpoints and held that Border Patrol agents may detain vehicles and question occupants "in the absence of any individualized suspicion at reasonably located checkpoints." *Id.* at 561–62, 96 S.Ct. 3074. In arriving at this conclusion, however, the Court "assume[d] that ... officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class." *Id.* at 559, 96 S.Ct. 3074.

More recently, the Supreme Court expressly distinguished the fixed automobile immigration checkpoints sanctioned in *Martinez–Fuerte* from an unconstitutional highway checkpoint program whose primary purpose was the general law en-

that checkpoint stops are 'seizures' within the meaning of the Fourth Amendment."). Though the San Clemente checkpoint was in operation only about 70% of the time, the ratio of deportable aliens apprehended to vehicles passing through the checkpoint was approximately 0.17% (17,000 ÷ 10,000,000 × 100 = 0.17%). If we assume that during the checkpoint's 70% operation time, approximately 7 million cars were seized as they passed through the checkpoint, then the ratio of aliens apprehended to vehicles seized was 0.24% (17,000 ÷ 10,000,000 × 100 = 0.24%).

**39.** During this eight-day period, the ratio of vehicles containing aliens (171) to vehicles seized (146,000) was .12% (171 ÷ 146,000 × 100 = 0.12%). Comparing the number of deportable aliens apprehended (725) to the number of vehicles seized (146,000) yields a ratio of .5% (735 ÷ 146,000 × 100 = 0.5%). The Supreme Court later referred to these rates of apprehensions, or "hit rates," in validating a Michigan checkpoint set up to apprehend drunk drivers, which had a hit rate of 1.5%. *See Michigan v. Sitz*, 496 U.S. 444, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).

**40.** *See Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (warrantless search of vehicle is reasonable under the Fourth Amendment when law enforcement officials have probable cause to believe it contains contraband); *see also United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it

justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

**41.** *See United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) ("Because the balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot.") (internal citations and quotations omitted); *Brignoni–Ponce*, 422 U.S. at 883–84, 95 S.Ct. 2574 (requiring reasonable suspicion that a vehicle contains illegal aliens for roving stops near the border); *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (holding that "except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment"); *see also Whren*, 517 U.S. at 810, 116 S.Ct. 1769 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

forcement objective of discovering and interdicting illegal narcotics. *See City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (invalidating the automobile checkpoint under the Fourth Amendment because its primary purpose was indistinguishable from the general interest in crime control). In *Edmond,* the Court noted that *Martinez–Fuerte* "emphasized the difficulty of effectively containing illegal immigration at the border itself" and that, even though the vehicular stops were not at the border, the fixed automobile checkpoints served an immigration border control function "made necessary by the difficulty of guarding the border's entire length." *Id.* at 38, 39, 121 S.Ct. 447. The Court further acknowledged that "the difficulty of examining each passing car was an important factor in validating the law enforcement technique employed in *Martinez–Fuerte.*" *Id.* at 43, 121 S.Ct. 447. Finally, the Supreme Court emphasized that the constitutionality of the Fourth Amendment intrusions imposed by an immigration checkpoint such as the one before me "still depends on a balancing of the competing interests at stake and the effectiveness of the program." *Id.* at 47, 121 S.Ct. 447.

■ Except to the extent that the St. Thomas Departure Control checkpoint implicates the public interest in controlling the flow of illegal aliens, the St. Thomas airport's Departure Control checkpoint satisfies none of the *Martinez–Fuerte* criteria. There is no similar formidable law enforcement problem in policing the Virgin Islands' compact international border (the INS does not really try to interdict aliens at the border); the checkpoint is singularly ineffective in its avowed purpose of catching illegal aliens; there would be nothing impractical about requiring reasonable suspicion based on a particularized study of the individual passengers walking through the airport before accosting any passenger; the passenger cannot be held

to expect that, once in the United States, she will have to identify her citizenship or right to be in the United States in order to board her flight to the continental United States or Puerto Rico; and the Departure Control checkpoint has been located exactly where it is most likely to arbitrarily and oppressively burden Virgin Islands airline passengers as a class.

This Court would be the first to agree that the United States has full power as a sovereign nation to limit the admission of aliens. *See Martinez–Fuerte,* 428 U.S. at 551, 96 S.Ct. 3074. Indeed, the public interest in controlling the flow of aliens into the United States at the international border or its "functional equivalent" is so great that it outweighs the Fourth Amendment's requirement of reasonableness. *See United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) ("Consistently ... with Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than at the interior."). For this reason, entirely suspicionless seizures and searches that would be unreasonable if conducted by INS officials at any place within the United States are considered reasonable at international borders and their functional equivalents. In this case, however, the United States does not defend the permanent St. Thomas Departure Control checkpoint as a border checkpoint or justify the seizure of all passengers passing through it as warrantless border seizures. Instead, it argues that the factual circumstances presented here are sufficiently analogous to those in *Martinez–Fuerte* to render the checkpoints constitutional under the Fourth Amendment balancing test set forth in that case for interior immigration traffic checkpoints. Applying that fact-specific balancing test here, I find that the

severity of the interference with the private traveler's individual liberty and with her expectation of · privacy clearly outweighs the public interest in ferreting out illegal aliens, particularly in light of the ineffectiveness of the checkpoint in accomplishing this public interest.

As already explained, the original purpose of the Departure Control checkpoint was based on the historical fact that persons could be legally present in the Virgin Islands without ever having been admitted to the United States for immigration purposes. The United States has now adopted as its official position that the purpose of the Departure Control checkpoint is to apprehend aliens illegally present in the Virgin Islands who try to move on to another location in the United States. The United States, however, has made no effort to support this proffered purpose with documented evidence of any particularly difficult, let alone "formidable," law enforcement problem or other official declaration of a serious problem. Even if I had a basis to view the checkpoint as serving the broader purpose of controlling the northward flow of aliens from the Virgin Islands to the continental "interior" of the United States, as in *Martinez–Fuerte*, the facts underlying *Martinez–Fuerte* have no similarity to those in this case.

First, the St. Thomas checkpoint is hardly "made necessary" by any "formidable law enforcement problem" posed by the influx of illegal aliens across the international border into the Virgin Islands. I take judicial notice that the physical border of the three major islands of St. Thom-

as, St. Croix, and St. John, Virgin Islands, which constitutes our international border, measures approximately eighty-five miles.[42] This border is minuscule compared with the nearly 2000–mile–long international border between the United States and Mexico involved in *Martinez–Fuerte*. Further, unlike that vast land border, the relatively short physical border of the Virgin Islands abuts the open sea, a circumstance that significantly reduces the opportunity, ease, and access for persons to enter surreptitiously. Aliens determined to enter the United States illegally cannot simply walk across the water from the island of St. Martin, the usual jumping-off place. Indeed, more than one illegal alien has died recently attempting to land by boat in the Virgin Islands.

Although the United States provided statistics on the effectiveness of the Departure Control· checkpoint, it provided no reasonable or credible evidence of the severity of the law enforcement problem presented by surreptitious entries across the Virgin Islands border. It is the policy of the United States Attorney to prosecute all illegal entries into the Virgin Islands. Yet the United States did not even present figures for the number of illegal aliens it has so prosecuted, whether Chinese,[43] Haitian, Guyanese, Dominican, or others. The only "evidence" bearing on the gravity of the law enforcement problem might be the undocumented, unsupported, and exaggerated opinion testimony of INS Supervisory Special Agent Todd Johnson, called as an expert by the United States. Special Agent Johnson testified, quite incredibly, that

---

**42.** I include the length of the perimeters of all three islands because there are no immigration checkpoints for travel among the islands. Each island is also surrounded by a twelve-mile band of territorial waters. Conceiving the border as the outside boundary of the territorial waters would expand the measure of the physical border to something closer to 200 miles at most.

**43.** I could take judicial notice that most, if not all, of the more than 500 illegal Chinese aliens prosecuted in 2001 either voluntarily turned themselves in to law enforcement officers or deliberately placed themselves in circumstances inviting apprehension.

there are "reports" that *two to three boats* with undocumented aliens land in St. Thomas or St. John *every day*, and that "the numbers are staggering," totaling 1500 to 5000 per year by extrapolation.[44] (*See* Johnson, Tr. at 152 (emphasis added).) The accuracy and believability of this estimate is seriously undermined by the credible evidence the United States did present that just over 600 illegal aliens were apprehended on St. Thomas in 2001: eighty-nine at the airport Departure Control checkpoint and 525 through other methods. Agent Johnson's guestimation that 900 to 4000 other aliens have remained here on the island is not believable, especially since Agent Johnson also opined that "all of the undocumented aliens that we encounter, their main focus or their main end of their journey, you might say, would be the Continental United States." (*See id.* at 132.) Accordingly, I find that the United States has not presented evidence of the kind of law enforcement problem in the Virgin Islands that demands to be controlled through the use of mandato-

ry, suspicionless seizure of every single airline passenger traveling wholly within the United States from the Virgin Islands to another State or the District of Columbia.[45]

Second, the checkpoint is not at all effective at apprehending those aliens who have managed to make it into the Virgin Islands undetected. With respect to this prong of the balancing test, or the degree to which the checkpoint's seizure of all passengers advances the public interest, the United States presented evidence of the number of persons passing through the Cyril E. King checkpoint and the number of persons apprehended there for violations of immigration law during the last calendar year. In calendar year 2001, 484,444 air passengers were systematically detained and, one-by-one, were questioned by INS inspectors at the Departure Control checkpoint. Yet only eighty-nine persons were apprehended and charged with violations of United States immigration law, representing a "hit rate" of approximately 0.018 percent.[46] (*See* Apr. 4, 2002 Hr'g on Mot.

44. According to Johnson, 525 aliens were apprehended in St. Thomas and St. John during 2001 through apparently random means other than the airport Departure Control checkpoint. (*See* Johnson, Tr. at 135.) In Agent Johnson's so-called expert opinion, these 525 aliens represent about one-third to one-tenth of the number of aliens who entered the United States illegally in 2001 at its international border surrounding the Virgin Islands. (*See id.* at 152.) These 525 aliens thus represent either one-third of 1500 or one-tenth of 5000 total illegal aliens.

45. In fact, the record suggests to me that whatever problem with illegal aliens we have at the Virgin Islands border is largely if not entirely attributable to the refusal of the United States to assign Border Patrol agents to police the international border of the Virgin Islands. The physical border of the United States Virgin Islands is categorized as an "open free" border. (*See* Johnson, Tr. at 133.) Unlike the southern and northern borders of the United States, and although the Virgin Islands are part of a Border Patrol

sector encompassing both Puerto Rico and the Virgin Islands, there is no regular or even irregular patrol of the Virgin Islands international border by the Border Patrol. (*See id.*) Under the INS structure, the Border Patrol Division is part of the Office of Enforcement, whose mission is to enforce immigration law through the detection and prevention of illegal entries into the United States. *See* 8 C.F.R. § 100.2(2)(c) (*setting out current structure of the INS*).

46. This figure represents the relevant ratio of persons apprehended to persons seized by the primary inspectors (89 ÷ 484,444 × 100 = 0.018%). It does not take into account the two voluntary returns and three "I–275 informational cases." (*See* Apr. 4, 2002 Hr'g, Gov't Ex. 1.) The United States suggested that the Court compare the number of persons apprehended to the number of persons taken to secondary inspections, but this would ignore the fact that every single automobile that passed through the San Clemente checkpoint, even if it only came to a "virtual halt," was

Supp., Gov't Ex. 1.) In contrast, 17,000 aliens were apprehended in one year at the San Clemente checkpoint in *Martinez–Fuerte.* During an eight-day period for which statistics were available, illegal aliens were found in 0.12 percent of the vehicles passing through the checkpoint, a hit rate that is nearly seven times the rate of apprehension here.[47] *See Michigan v. Sitz,* 496 U.S. at 455, 110 S.Ct. 2481 (comparing a Michigan sobriety checkpoint's hit rate to the San Clemente checkpoint's hit rate during this eight-day period). Stated in terms of the ratio of aliens apprehended to vehicles passing through the San Clemente checkpoint, the hit rate was 0.5 percent, a rate nearly twenty-eight times the 0.018 percent rate for 2001 at the St. Thomas Departure Control checkpoint. *See id.* at 455, 110 S.Ct. 2481 (finding no justification for invalidating a sobriety checkpoint with a hit rate of 1.5 percent, three times the hit rate in *Martinez–Fuerte*).

It requires no exhaustive examination for me to conclude that, at a rate twenty-eight times lower than the rate in *Martinez–Fuerte,* the INS's apprehension of only eighty-nine persons for violations of immigration laws in one year does not constitute an "effective" law enforcement program that (1) advances the public interest to any appreciable degree or (2) is necessitated by the impossibility of patrolling the physical border. *See Edmond,* 531 U.S. at 41, 47, 121 S.Ct. 447.

Special Agent Johnson, who manages the Investigations, Detention and Removal Programs here in St. Thomas and who was called by the United States to testify regarding the effectiveness of the airport checkpoint, is of the opinion that assigning Border Patrol agents in the Virgin Islands would much more effectively control the flow of illegal aliens into and through the Virgin Islands. (*See* Johnson, Tr. at 160–61 (expressing the opinion that "Border Patrol presence is greatly needed here" as a "[s]upremely effective" law enforcement tool).)[48] Instead, the United States uses the immigration inspectors already operating the Foreign Arrivals Gate to set up and staff a passive "choke-point" Departure Control Gate to apprehend illegal aliens who have not been stopped from coming in at the border. I am mindful that the "effectiveness" prong of the balancing test "was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger."[49] In evaluating the enforcement tool the United States chose to utilize, however, it is appropriate for me to consider the INS's failure or refusal to employ the supremely effective Border Patrol to police the Virgin Islands borders. Moreover, I have al-

---

considered by the Supreme Court to have been seized, just as every single passenger is seized when she is forced to stand behind the line, wait until called, present documents, and establish her right to be in the United States before she will be allowed to proceed to her flight.

47. As already noted, the ratio of vehicles passing through the checkpoint (10,000,000) to the number of aliens apprehended (17,000) would be approximately 0.17%.

48. Even without the Border Patrol, 525 aliens were apprehended in St. Thomas and St. John during 2001 through apparently random means other than the airport checkpoint, which is nearly six times the 89 aliens seized by Inspections at Departure Control. (*See* Johnson, Tr. at 135.) This comparison renders unbelievable Agent Johnson's testimony that the Departure Control checkpoint serves as a "primary offense" in apprehending illegal aliens. (*Id.* at 134.)

49. *Michigan v. Sitz,* 496 U.S. at 453, 110 S.Ct. 2481.

ready shown how the Virgin Islands does not participate in the usual mechanisms for allocating political accountability on the national level.

Instead of using the more effective Border Patrol to aggressively apprehend aliens attempting to enter the Virgin Islands illegally, the United States has taken the easy course of allowing illegal aliens who have managed to make it ashore to remain here until caught by a chance confluence of unrelated events or until they try to move on to another United States jurisdiction. In the hope of catching the illegal alien who attempts to fly directly to the mainland, the United States ·detains every single traveler destined for Puerto Rico, a State, or the District of Columbia and requires her to declare where she is going and prove to an INS inspector her right to be admitted into the United States. Nothing in *Martinez–Fuerte* could possibly validate this "containment" approach to immigration control, which consists essentially of making no attempt to interdict the aliens who illegally sneak into the Virgin Islands across its international border each year in the hope that INS inspectors will catch those few at the Departure Control checkpoint who try to move on to the continental United States. An illegal alien present in the Virgin Islands is already *in* the United States, and her presence in this small island community, for whatever period of time, is just as offensive to the public interest in controlling immigration as when she attempts to move on to the continental United States or Puerto Rico. The record is compelling that the Congress and the INS view the Virgin Islands as somehow less worthy of primary protection from unlawful immigration than the rest of the United States. In my view, this defies all logic and represents yet another way in which the circumstances here are eminently distinguishable from those in *Martinez–Fuerte.*

Third, there would be nothing impractical about requiring reasonable suspicion based on a particularized study of the individual passengers walking through the airport before accosting any passenger. Quite unlike the situation in *Martinez–Fuerte,* an illegal alien passing through the immigration Departure Control Gate at the Cyril E. King Airport is not hidden inside a vehicle, nor is there any evidence that the flow of travelers is so heavy that individualized observation of each passenger traveler would be impractical. *See Edmond,* 531 U.S. at 43, 121 S.Ct. 447 ("[T]he difficulty of examining each passing car was an important factor in validating the law enforcement technique employed in *Martinez–Fuerte . . . .*").

Fourth, the passenger cannot reasonably be held to expect that she will have to identify her citizenship or right to be in the United States in order to board her flight to the United States or Puerto Rico. Even in the atmosphere of reduced privacy expectations in airports, the Fourth Amendment mandates that a traveler remain free from suspicionless detention for questioning when the purpose of the detention is not reasonably related to general airline security, flight safety, detecting contraband, interdicting the flow of illegal weapons, and the like. *See, e.g., Florida v. Rodriguez,* 469 U.S. 1, 5, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) ("Certain constraints on personal liberty that constitute 'seizures' for purposes of the Fourth Amendment may nonetheless be justified [in an airport] even though there is no showing of 'probable cause' if 'there is articulable suspicion that a person has committed or is about to commit a crime.' ") (quoting *Florida v. Royer,* 460 U.S. 491, 498–99, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Domestic travelers at airports may also have come to expect to have their luggage searched by airport personnel or federal agents, either as a security measure or, as

is the case in the Virgin Islands, by U.S. Customs agents at the one-way customs border approved by the Court of Appeals in *Hyde*. These measures, however, are directly related to the law enforcement needs occasioned by airline travel and the separate customs territory of the Virgin Islands. None of these security or customs needs can serve to alert the airline traveler that she will be required to prove her citizenship and/or her right to be in the United States before she is allowed to travel from one place in the United States to another.[50] It is no answer that the unconstitutional practices of the INS over the years may have so intimidated travelers that "most people just present their documents." As established in the earlier discussion, the reality is that INS inspectors regularly require proof of citizenship or an alien's right to be in the United States, in spite of the official position that passengers need not show a passport or other documentation.

Fifth, the Departure Control checkpoint has been located exactly where it is most likely to "bear[ ] arbitrarily [and] oppressively on [Virgin Islands airline passengers] as a class." *Martinez–Fuerte*, 428 U.S. at 559, 96 S.Ct. 3074. Requiring each passenger to stop and establish his or her immigration status to the INS inspector's satisfaction after having presented her ticket to the airline, having obtained a boarding pass, having successfully negotiated the customs checkpoint, and having just seen her luggage disappear on a conveyor belt for loading on the aircraft, but before being permitted to board an air-

plane, is truly arbitrary, oppressive, and intrusive. Unlike *Martinez–Fuerte*, where travelers could avoid the checkpoint by taking another highway, travelers flying from the Cyril E. King Airport cannot avoid the checkpoint or the suspicionless seizure if they want to board their plane. To suggest, as the United States has done, that a traveler can avoid the intrusion by not boarding her flight merely establishes the unreasonableness of the seizure and its arbitrary and oppressive burden on the fundamental right of persons in the Virgin Islands to travel within the United States of America.

Finally, for a person traveling within the United States, the interest in traveling free of unreasonable seizure by government officials is grounded in both the fundamental right to travel and the significant interest in being free from unreasonable governmental intrusion. *See Torres v. Puerto Rico*, 442 U.S. 465, 469, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979); *Califano v. Torres*, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978); *Lopez v. Aran*, 844 F.2d at 902. Contrary to the United States' assertion, the intrusion on that interest at the St. Thomas airport Departure Control checkpoint is significantly more than "minimal." Even if the encounters typically last less than a minute, each and every traveler must come to a complete stop and satisfy an inspector that she has a right to be in the United States. Examining the particular facts of this case as I must to make sure that the precise scenario passes muster under the Fourth Amendment,[51] I find that the severity of

---

**50.** The United States makes much of the fact that there are signs alerting persons that they must pass through an immigration checkpoint. According to the United States, the warning and its concomitant lack of surprise reduce the level of "subjective intrusion" and contribute to the reasonableness of the stop. Forewarning persons that they will be subject to regularized seizure, however, does not necessarily render the stop constitutional. *See*

*Edmond*, 531 U.S. at 35, 121 S.Ct. 447 (where motorists were warned ahead of a regularized narcotics checkpoint, checkpoint was nevertheless held unconstitutional under the Fourth Amendment).

**51.** *See Martinez–Fuerte*, 428 U.S. at 565, 96 S.Ct. 3074 ("[O]ur holding today is limited to the type of stops described in this opinion.")

the interference with an individual passenger's liberty, with her fundamental right to travel, and with her significant interest in being free from unreasonable governmental intrusion clearly outweighs the demonstrated minimal need for the checkpoint and its ineffectiveness at apprehending persons whose presence in the United States may violate United States immigration laws.

In support of its position that the checkpoint is constitutional under the Fourth Amendment, the United States compares the checkpoint operation here to the checkpoint operation held for the most part constitutional by the First Circuit Court of Appeals in *Lopez v. Aran*. In *Lopez*, INS agents at the Isla Verde Airport on Puerto Rico conducted preinspection interviews of some passengers pursuant to section 212(d)(7) and 8 C.F.R. § 235.5. There, not all passengers were questioned and those who were did not necessarily come to a halt or even slow down, but were questioned as they walked toward the departure gate. *See Lopez v. Aran*, 844 F.2d at 900–01. The agents were instructed to take physical possession of the passenger's ticket during any examination that took place. *Id.* at 907. Instead, the majority of passengers voluntarily handed over their tickets on the assumption that the INS officials were acting for the airport or the airline. *Id.* The plaintiff in *Lopez* argued that the preinspection operation constituted an unconstitutional seizure under the Fourth Amendment.

Even before discussing the First Circuit Court of Appeals' ruling, I categorically reject the United States' contention that

the checkpoint in *Lopez* is sufficiently similar to the Departure Control Checkpoint here to help me decide this case. The salient fact distinguishing the two checkpoints is that all travelers are stopped at the St. Thomas Departure Control checkpoint. In *Lopez*, only some travelers were questioned on the fly by the immigration officials. Thus, to the extent that a majority of a panel of the Court of Appeals for the First Circuit concluded that the brief queries regarding citizenship were reasonable intrusions not unlike those in *Martinez–Fuerte*, it is of no persuasive force when applied to the facts of the case before me.

Significantly, the First Circuit Court of Appeals in *Lopez* held that the immigration inspectors' practice of physically taking the tickets of the travelers they did question was an unreasonable seizure in violation of the Fourth Amendment because the practice "substantially burdens the right of travelers." *See Lopez v. Aran*, 844 F.2d at 907.[52] To this extent, *Lopez* confirms my ruling that the stop and detention of all airline passengers funneled through the Departure Control checkpoint until they prove their right to be admitted into the continental United States constitutes an unreasonable seizure in violation of the Fourth Amendment. It too substantially burdens the rights of those travelers.

Weighing the competing interests at stake, I conclude that the systematic, unnecessary, ineffective, intrusive, and oppressive immigration departure control checkpoint at the Cyril E. King Airport on St. Thomas, Virgin Islands is not compatible with the Fourth Amendment. Ac-

---

**52.** Of course, in my view, Chief Judge Torruella had it right in viewing the entire checkpoint program to be invalid under the Fourth Amendment, not just the ticket-taking aspect. "[T]he INS has taken the easiest way out, which regardless of effectiveness, causes a serious intrusion upon the millions of United States citizens transiting the San Juan airport on their way to the mainland." *Lopez v. Aran*, 844 F.2d at 915 (Torruella, J., dissenting).

cordingly, INS inspectors must have an articulable individualized suspicion that the person is illegally present in the United States before she or he may detain a traveler leaving the Virgin Islands for Puerto Rico or the continental United States and require her to satisfy the inspector of her citizenship and/or right to be in the United States before being permitted to board her plane. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *cf. Edmond*, 531 U.S. at 41, 47, 121 S.Ct. 447 (invalidating a checkpoint that did not satisfy one of the "limited exceptions [such as *Martinez–Fuerte* ] to the general rule that a seizure must be accompanied by some measure of individualized suspicion"); *INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (reiterating the rule that when official questioning goes beyond a consensual police-citizen encounter to one where the person questioned must answer before she is free to leave, the Fourth Amendment imposes a "minimal level of objective justification to validate the detention or seizure"); *Lopez v. Garriga*, 917 F.2d 63, 69–70 (1st Cir.1990) (Although INS agents can randomly question travelers about their citizenship at the airport immigration checkpoint, when a traveler is not free to refuse to answer, the consequent seizure requires articulable, reasonable suspicion that the traveler is an alien.). Since the defendant was detained and questioned without such individualized suspicion, and since the detention was clearly a seizure within the meaning of the Fourth Amendment, any statement made by the defendant in the wake of this unconstitutional seizure will be suppressed.

## ORDER

For the reasons stated in the accompanying Memorandum of even date, it is hereby

**ORDERED** that the defendant's motion to suppress is **GRANTED**.